GILBERT KNUDSON, Appellant, v. BOARD OF SUPERVISORS OF HAMILTON COUNTY, et al., Appellees.

**Drainage:** CONSTRUCTION OF DRAIN: PRESUMPTION: BURDEN OF
1 PROOF. Where a land owner, who was notified of the proposed change in the location of a drainage ditch filed his claim for damages, proposed a compromise and settlement which was accepted and paid, and he receipted in full of all his damages, a presumption arose that the ditch was constructed in the new location according to the revised plans; and the burden of showing that the ditch was not to be constructed according to the revised plans, but was of a different character and in a different location from that proposed, was upon him, when seeking to restrain the construction.

**Same:** CONSTRUCTION OF DRAIN: ESTOPPEL. Where a landowner
2 without protest accepted and retained the amount of damages awarded for the construction of a drainage ditch in a new location, with full knowledge of the amount of his land that would be taken, he could not enjoin the construction on the ground that it was not located according to the final plan.

*Appeal from Hamilton District Court.*—HON. ROBERT M. WRIGHT, Judge.

THURSDAY, NOVEMBER 13, 1913.

SUIT in equity to enjoin defendants from constructing a drainage ditch over plaintiff's land and for other equitable relief. On the issues joined the case was tried to the court resulting in a decree dismissing plaintiff's petition, and he appeals. *Affirmed.*

*Wesley Martin,* for appellant.

*J. M. Blake* and *D. C. Chase,* for appellees.

Deemer, J.—October 5, 1908, certain landowners petitioned the board of supervisors of Hamilton county for the establishment of a drainage district in said county, which was afterward known as Mud Lake district No. 71. As a part of the petition was the following: ''Said ditch or ditches are described and located by the accompanying plat or description shown and set forth herein. But the engineer in charge may deviate from such description and plat in so far as such deviation, in his judgment, may be necessary in order to make the improvement practicable.'' Pursuant thereto an engineer was appointed who made a report favoring the establishment of the same, which was accompanied by a plat and profile. Plaintiff's land was within the proposed district, and, according to the original plat and profile, a ditch was to be constructed on the east side of a road which was one of the boundaries of plaintiff's land between sections 27 and 28.

Plaintiff filed a claim for damages in the sum of $1,200, and the commissioners appointed to assess the damages allowed him the sum of $850 thereon. Thereafter the board made an order establishing the district, but as a part thereof made the following change: ''. . . Wherefore the prayer of the petitioners is granted and said drainage district is hereby established as per plat and profile returned by the engineer making the preliminary survey, and the ditches are located as shown on the plat, except that the part of the ditch running north and south between sections 27 and 28 on the east side of the highway shall be located on the west side of such highway, and the Koop branch shall be changed and located along the natural waterway, and such drainage district shall be known as the Mud Lake drainage district No. 71.'' Damages were allowed plaintiff in the sum recommended by the commissioners, to wit, $850. The board also made the following as a part of the order: ''Moved and seconded that the auditor be instructed to give Gilbert Knudson and D. B. & L. B. Jewell

notice of the change made in the location of the ditch to the west side of the highway on his land in section 28, Lyon township, Hamilton county, Iowa, and their damages allowed as follows: Gilbert Knudson, $270; D. B. & L. B. Jewell, $250." And these additional damages were allowed and assessed as a part of the expense. The auditor gave notice to the plaintiff and the other parties named and in the notice stated: ". . . at which time the board established the Mud Lake district, also changed the location of the ditch between sections 27 and 28, Lyon township, so as to run the ditch on the west side of highway instead of the east side of highway. And on account of said change the board have allowed you damages as follows: Gilbert Knudson, east side of section 28, $270; D. B. & L. B. Jewell, east side of section 28, $250." Pursuant to this notice, plaintiff filed the following claim for additional damages: "The undersigned claims to be the owner of the E. ½ of the N. E. ¼, section 28, township 87, range 24, which drainage district has been petitioned for by H. Ferbitz and others, and you are hereby notified that, in the event of said drainage district being established, I claim damages in the sum of $700."

A settlement was talked of and plaintiff presented the following proposition to the board: "To the Honorable Board of Supervisors of Hamilton County, Iowa: Comes now Gilbert Knudson, the owner of the land on the west side of the highway running north and south between sections 27 and 28, Lyon township, within the Mud Lake drainage district, and hereby accepts the sum of $550 in lieu of $270 allowed, in full for all claims for damages for the location of the ditch on the west side of said highway on his said premises; and he especially waives all questions of his rights as to the location of said ditch, and the question of time and notice." Pursuant to this the board made the following record: "J. E. Burnstedt, attorney for Gilbert Knudson, appeared before the board and objected to the damages allowed to said Knudson on April 1, 1909, in the Mud Lake drainage district No. 71, and by way

of compromise the board accepted the proposition presented by said J. E. Burnstedt, the same being placed on file. The board adjourned for further action."

Plaintiff served notice of appeal to the district court from some of the orders of the board, the notice being served on July 25, 1910, but nothing seems to have been done with this appeal. On March 11, 1911, the county auditor issued to plaintiff a warrant for the sum of $1,400 in full of all damages due to the establishment of the district, and plaintiff received and cashed the same on October 5, 1911; he, without returning any of the money received, commenced this action to restrain the board and the contractors from cutting the ditch across his land which was on the west side of the highway hitherto mentioned.

Whilst the plat and profile of the district seem to have been introduced in evidence, they are not reproduced in the record, and all we know about them is what is testified to by the witnesses. There is no dispute in the record as to the facts so far narrated, but plaintiff claims that, in carrying out the revised plans, the board and the construction company did not locate the ditch according to the plans, placing it upon his land farther than was intended; and that they also took more land for the ditch than was contemplated by any of the plans; and as alternative relief he asked for additional damages because of the taking of more land than was contemplated, and he averred that he was and is ready, able, and willing to do equity in the case.

It is apparent from the record, so far quoted, that the issue presented by plaintiff is a narrow one. He admits an enlarged allowance by reason of a change in the location of the ditch and the settlement set out; but he

1. DRAINAGE: construction of drain: presumption: burden of proof.

claims that the defendants ultimately changed the location of the ditch from its proposed location according to the revised plans and took more of plaintiff's land than was contemplated. Defendants insist that even if these things were established, the

truth of which it denies, plaintiff's remedy, if he had any, was by appeal, and further pleads that plaintiff was fully advised as to the location of the ditch and the amount of land taken when the appraisers came to assess his damages by reason of the relocation of the ditch; that notwithstanding this he made the settlement, did not appeal, and deferred any action until he commenced this suit; and that, by reason of these facts, he is estopped from maintaining his present suit. By reason of the absence of the plats, profiles, field notes, etc., of the surveyor showing the original location of the ditch and its exact location when changed over upon plaintiff's land, we have had some difficulty in arriving at the exact facts with reference to these matters. Both sides rely upon oral testimony which is more or less indefinite and unsatisfactory.

But it is clear from the record, so far considered, that presumptively, at least, plaintiff has no case, for he was notified of the proposed change of the ditch, filed his claims for damages, proposed a settlement which was accepted by the board, and received his money not only for damage caused by the original location but by reason of the change and receipted in full for all his damages. The burden is upon him to show that the ditch was not established or dug according to the revised plans but that it was located at a different place and was a different ditch from the one proposed when the change of location was made. Upon this proposition we think he has failed.

Moreover, plaintiff still retains the money which was paid him in settlement of the matter and has never offered to refund the same, save as such offer may be inferred from his indefinite offer to do equity. Again it appears from plaintiff's own testimony that he knew of the proposed change, as finally made, when the appraisers went over the land for the purpose of assessing damages, and he did not appeal or do anything else by way of protest but received the money which was agreed to upon

2. SAME: construction of drain: estoppel.

settlement without complaint. Again his testimony as to the
additional amount of land taken is very indefinite. We quote
the following from the record as bearing upon these propo-
sitions:

. . . I should say the second lot of stakes that I
noticed was some further in than the others, was more than
weeks before they commenced digging on my land; when the
ditch was dug that brought the dirt up to the fence and where
there was deep digging a little over. . . . I don't remem-
ber that any member of the board told me after I received
the $550 for the location on the west side of the highway on
my land that I was to have the dirt put into the highway. I
wouldn't say any of them said so. The way the ditch was
to be, according to the first stakes, as I supposed, was 85 to
90 feet on my land; the way I figured it in the first place.
I received for this $550 damage. It was finally settled by
the extra damages. Q. As I understand it, your only claim
for damages now in this case is the fact that more land was
taken than would have been taken if the ditch had been con-
structed where the original stakes were? A. Yes. Q. When
did you first ascertain that this wasn't going to be exactly
where you thought it would be? A. When the fellows was
down there allowing damages was when I first caught on to
it. The first thing that started my suspicion was of that
thing there, was when them damage fellows was down there.
. . . I had heard they had done the same thing they did
on my land further north. I commenced to get suspicious
and I have been suspicious ever since I discovered that they
were running this way on the people north of me, a month,
perhaps, before they struck my land. Q. Now when do you
say this new location was first discovered by you? A. Well, I
commenced to suspect when those damage fellows were down
there, and then afterwards when I heard what they had done.
Mr. Burnstedt was authorized by me to make the agreement.
I received in all $1,400 damages. . . . Q. Have you figured
out how much land this ditch takes as it is actually con-
structed from your land along the north and south road
there? A. No. Q. Can you give an idea of how much land
it actually takes? A. Why, I wouldn't be able to hit it very
close, because it is so much wider at places than it is at others,
that I wouldn't be able to say close enough to make a guess.

Q. Now you received for that land taken the sum of $550, didn't you? A. Yes. Q. You have never tendered it back? A. No, I have it. I know what you mean. Q. You are satisfied with the bargain; in other words, you got the money and you kept it, didn't you? A. Well, it was for the change on the west side of the road. Q. Yes? A. But not as far as it is. Q. Now, at that time you waived all question as to the location of the ditch, did you not? A. My attorney will explain the meaning of that agreement. I mean, my attorney at that time. Q. Was this agreement authorized by you or not? A. Yes, I authorized him.

Another significant fact is the record discloses that plaintiff had his fence over upon the highway ten to thirteen feet from the true line, and the dirt from the ditch and the spoil bank was as a rule placed as close to the highway as possible. Plaintiff claims that all the dirt was to be thrown into the highway, and that, as the defendants did not do this, it placed the ditch farther over upon his land than was intended. But the testimony does not sustain this contention.

On the whole record, we are convinced that the decree of the trial court is correct, and it is *Affirmed.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concurring.